JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

JEREMIAH PYLE

**DEFENDANTS**

CREDIT WHOLESALE COMPANY, INC, d/b/a WHOLESALE PAYMENTS, and JOHN DOES 1 – 20

**(b)** County of Residence of First Listed Plaintiff: Collin
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: ____________
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

BURKE BOGDANOWICZ PLLC
1201 Elm Street, Suite 4000 Dallas, Texas 75270
(214)888-2824 (Tel./Fax)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [x] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
29 USC 207

Brief description of cause:
Overtime Misclassification

## VII. REQUESTED IN COMPLAINT:

- [x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE ____________ DOCKET NUMBER ____________

DATE SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| JEREMIAH PYLE,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT WHOLESALE COMPANY, INC, d/b/a WHOLESALE PAYMENTS, and JOHN DOES 1 – 20,<br><br>Defendants. | CAUSE NO: |

## CLASS ACTION COMPLAINT

Plaintiff/Class Representative Jeremiah Pyle ("Pyle"), an individual, by and through his undersigned counsel, bring this Class Complaint (the "Complaint") on his behalf and on behalf of all others similarly situated, against Defendant Credit Wholesale Company, Inc., doing business as, Wholesale Payments ("WPI"), a Texas corporation, and DOES 1 through 20, inclusive (the "Doe Defendants," and collectively the "WPI Enterprise") for declaratory relief, injunctive relief and damages, and alleges as follows:

## I. OVERVIEW

1. This case arises from the WPI's uniform scheme to classify managers and related sales personnel as independent contractors on paper while exercising pervasive control over their day-to-day work, paying them as W-2 employees, providing benefits and company infrastructure, and imposing standardized compensation and chargeback policies.

2. WPI recruited managers with fraudulent promises of "40X buyout opportunities"—lump-sum payments equal to 40 times monthly residuals with no production requirements—a representation WPI made uniformly to all prospective managers during recruitment, repeated in

training materials, and never honored.

3. WPI's policies, handbooks, contracts, and centralized practices applied uniformly to Plaintiff and the putative class/collective members and resulted in common injuries including unpaid overtime, improper deductions/set-offs, and manipulation of residual compensation through company-controlled reporting systems.

4. In March 2024, WPI replaced its transparent reporting platform (MX ISO/Agent) with a new system (IRIS) that obscured cost data and gave WPI unilateral control to manipulate residual calculations. Following this system-wide change, managers' and agents' residuals dropped 15-30% across the board with no adequate explanation, despite repeated requests for documentation.

5. Beginning in March 2022, WPI implemented a uniform "Do Not Accept" (DNA) List policy that prevented agents with install ratios below 70% from boarding new merchants without CEO/President approval, systematically reducing managers' ability to earn contingent compensation under portfolio purchase agreements and frustrating the essential purpose of those agreements.

6. In or around October 2023, WPI required all managers to sign standardized "Manager Liability Forms" authorizing WPI to deduct equipment costs from residuals if merchants failed to process within 45 days—even where merchants or agents had already paid for equipment, or equipment was returned and redeployed to new merchants, resulting in multiple recoveries for the same hardware.

## II. PARTIES

7. Class Plaintiff Jeremiah Pyle ("Pyle" or “Class Plaintiff”) is a natural person who worked for WPI in Texas as a sales manager and team leader from approximately August 1, 2020,

through 2024. He brings this action on his own behalf and on behalf of all others similarly situated.

8. Defendant Credit Wholesale Company, Inc. d/b/a Wholesale Payments, Inc. ("WPI") is a Texas corporation with its principal place of business in Lubbock, Texas. WPI operates as a payment processing company that employed and/or jointly employed Plaintiff and the putative class/collective members.

9. Class Plaintiff is unaware of the Doe Defendants' true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein as Does 1 through 20, inclusive, and therefore, sues these Doe Defendants by such fictitious names. Class Plaintiff will amend this Complaint to show the true names and capacities of the fictitiously named Doe Defendants when Class Plaintiff ascertains the same.

10. Class Plaintiff is informed and believes, and based thereon alleges, that at all material times each of WPI and the Doe Defendants was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged herein, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

## III. JURISDICTION, VENUE, AND DIVISION

11. **Jurisdiction**. This action arises under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 et seq. The Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), and supplemental jurisdiction over related Texas-law claims under 28 U.S.C. § 1367. The Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the putative class exceeds 100 members, the amount in controversy exceeds

$5,000,000, and minimal diversity exists.

12. **Venue**. Venue is proper in the Northern District of Texas, Lubbock Division, under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Division, including WPI's direction and implementation of the classification, compensation, and deduction policies at issue as applied to Plaintiff and other workers in Lubbock County and surrounding areas, and because WPI is subject to personal jurisdiction here.

13. **Division Assignment**. Assignment to the Lubbock Division is proper under the Local Civil Rules of the Northern District of Texas because these claims arose, in substantial part, in Lubbock County and surrounding counties within the Lubbock Division.

## IV. FACTUAL ALLEGATIONS

### A. The Payment Processing Industry (Background)

14. WPI operates as an Independent Sales Organization ("ISO") in the payment processing industry. ISOs recruit and manage sales agents who market merchant services and payment processing solutions to businesses that accept credit and debit card payments.

15. Sales agents and managers in the payment processing industry typically earn "residual" compensation, i.e., ongoing monthly revenue shares based on transaction fees generated by merchants they bring to the ISO or payment processor.

16. The putative class members worked as managers, team leaders, and similarly titled personnel who were responsible for recruiting, training, and managing teams of sales agents, maintaining production metrics, and overseeing office operations—not for personally originating merchant accounts.

### B. Recruitment Through Uniform Fraudulent Misrepresentations

17. Beginning in or around 2020 and continuing through at least 2024, WPI uniformly represented to prospective managers, including Class Plaintiff, that WPI offered "40X buyout opportunities" under which WPI would purchase a manager's residual portfolio for a single lump-sum payment equal to 40 times the manager's monthly residual income, with no production requirements or contingencies.

18. WPI's CEO, Mark Hodges, personally made these representations during in-person recruitment meetings at WPI's Lubbock headquarters, over telephone calls with prospective hires, and through WPI's authorized agents and training materials.

19. For example, during recruitment meetings, Hodges asked prospective managers: "What could you do with $400,000?"—using this specific example to illustrate WPI's purported buyout structure (40 × $10,000 monthly residual = $400,000).

20. WPI incorporated these representations into its training materials and encouraged existing managers to repeat them when recruiting agents to their teams.

21. WPI knew these representations were false. WPI never intended to pay—and never has paid—any manager a single lump-sum payment equal to 40 times monthly residuals without substantial contingencies tied to future production metrics controlled by WPI.

22. Instead, WPI's actual portfolio purchase agreements ("PPAs") required managers to generate hundreds of new merchant accounts within strict timeframes and imposed "active processing" requirements at the time contingent payments became due—conditions entirely within WPI's control through policies described below.

23. These uniform misrepresentations induced Plaintiff and putative class members to leave prior employment, join WPI, and enter into agreements that systematically undercompensated them.

## C. WPI's Control, Treatment as Employees, and Common Policies

W-2 Pay and Benefits

24. Notwithstanding boilerplate independent-contractor language in certain form agreements, WPI paid managers, including Class Plaintiff, as W-2 employees and subsidized employer-provided benefits, including health, dental, and vision coverage.

25. WPI's treatment of managers as W-2 employees for payroll and benefits purposes demonstrates WPI's recognition of their employee status and contradicts WPI's simultaneous classification of them as independent contractors to avoid overtime obligations.

Centralized Workplace and Infrastructure

26. WPI required managers, including Plaintiff, to work Monday through Friday from WPI's office at 901 N. McDonald Street, Suite 403, McKinney, Texas 75069 (the "McKinney Office").

27. WPI purchased, built out, and maintained the McKinney Office specifically to house managers and call-center agents. At all relevant times, the McKinney Office housed between three and eight sales managers.

28. WPI maintained the utilities, internet, computers, office supplies, and other infrastructure necessary for managers to carry out their assigned duties.

29. WPI provided the computers and other material goods necessary for managers to perform their work.

Tools, Branding, and Exclusivity

30. WPI required managers to use WPI-branded email addresses, training materials, and marketing materials in all dealings with agents, merchants, and third parties.

31. WPI prohibited managers from using any branding other than WPI's and required

managers to present themselves solely as representatives of WPI.

Schedules, Hours, and Supervision

32. WPI imposed daily schedules for managers that itemized their tasks on an hourly basis from approximately 7:30 a.m. to 4:30 p.m.

33. WPI required managers to take lunch between 12:00 p.m. and 1:00 p.m. daily and prohibited deviation from this lunch period.

34. Managers frequently worked past 7:00 p.m. and on weekends to meet WPI's production expectations, quotas, and deadlines.

35. WPI imposed numerous production metrics and quotas to control managers' efforts, including:

a. Minimum weekly numbers of new merchants boarded

b. Minimum weekly numbers of merchants actively processing

c. Minimum weekly numbers of new agents hired

d. Daily recruiting call quotas

e. Written records of daily recruiting efforts

f. Weekly minimum numbers of new hires in training

g. Mandatory training sessions with new hires within the first week

h. Weekly team meetings

i. Monthly performance reviews of team members

j. Weekly reports submitted to WPI leadership regarding team performance

Job Duties vs. Paperwork

36. While certain form agreements referenced "agent"-type duties (such as originating and boarding merchants), managers like Plaintiff were not responsible for personally originating

merchant accounts.

37. Managers' compensation included a 20% team-residual override on merchants boarded by agents on their teams, with additional per-deal bonuses and early-tenure incentives pursuant to uniform addenda, not compensation tied to their own merchant origination.

38. All agents recruited to work on any manager's team became agents of WPI, not of the individual manager. WPI retained ultimate control over all agents and managers, including the power to fire managers and agents, cease accepting merchants from agents, and reassign agents to other managers.

Restrictive Covenants

39. WPI required managers, including Plaintiff, to sign standardized non-solicitation and related restrictive-covenant agreements as a condition of working with WPI, further evidencing WPI's employer-level control.

## D. Standardized Compensation Structures and Manipulation

Residual/Override Structure and WPI's Control Over Calculations

40. Under WPI's standardized compensation model, managers earned:

a. Commission-based residuals calculated by subtracting WPI's purported "costs" from gross transaction revenue and multiplying by 20%; and

b. Manager overrides tied to their teams' production (20% of team residuals, $100 per "deal" completed by team agents, and early-tenure bonuses).

41. WPI controlled the reporting and underlying "buy-rate" and "cost" inputs used to calculate residual payments.

42. WPI's form agreements stated that managers would receive "the same cost structure as WPI is charged by its vendors" and that managers would "receive pass-thru reductions or

increases in pricing."

43. In reality, WPI did not bill managers based on WPI's actual vendor costs. Instead, WPI devised and applied its own artificial cost structure—a "cost-plus" model—that systematically inflated deductions and reduced managers' residual payments.

The MX ISO/Agent to IRIS System Change (March 2024)

44. Until March 2024, WPI utilized a back-office reporting platform called MX ISO/Agent, provided by WPI's payment processing vendor Priority Payments, that allowed managers and agents to log in, track their merchants, view detailed residual calculations with sufficient revenue and expense data fields, and manage their portfolios.

45. MX ISO/Agent offered real-time reporting that allowed managers to see revenues and expenses related to merchant transactions, chargebacks, and commissions with granular detail.

46. In or around March 2024, WPI transitioned managers' teams from MX ISO/Agent to a new system called MX Connect, offered by ISIR CRM ("IRIS").

47. Under IRIS:

a. Managers could no longer access detailed data previously available through MX ISO/Agent;

b. WPI gained the ability to manipulate data received from Priority Payments before distributing reports to managers and agents; and

c. Revenue and expense line items were bundled into single data fields, eliminating transparency into how costs were calculated.

48. Following the system-wide transition to IRIS, managers' and agents' residual revenue dropped by 15-30% across the board.

49. Despite multiple requests from Plaintiff and other managers for documentation and

adequate explanation for the residual reductions, WPI refused to provide such documentation or explanation.

50. On information and belief, WPI systematically overcharged managers and agents for additional and/or increased costs after switching to IRIS but concealed this practice by eliminating the transparency previously afforded by MX ISO/Agent.

51. WPI's CEO, Mark Hodges, acknowledged directly to at least one manager that he was aware IRIS was overbilling agents and managers, yet WPI never corrected the errors or reimbursed affected personnel.

Retroactive Cost Changes

52. WPI unilaterally altered "cost" inputs used in residual calculations—without authorization, contrary to contract language, and retroactively across existing merchant accounts—reducing managers' compensation across the board.

53. Agents and managers had negotiated merchant agreement terms based on the cost structures in effect at the time of merchant onboarding. WPI's retroactive cost changes violated those expectations and the terms of managers' agreements, which prohibited WPI from increasing costs beyond what WPI actually paid its vendors.

Double and Triple Billing Practices

52. WPI systematically billed the same cost to multiple parties, including the merchant, the agent, and the manager, and frequently collected the full cost from each party.

53. For example, if a merchant's customer initiated a chargeback, WPI would bill the chargeback fee to the merchant, the agent, and the sales manager, and would often collect the fee from all three parties, resulting in WPI recovering the same cost multiple times.

54. WPI also billed managers multiple times for the same cost, often deducting the cost

from managers' residuals repeatedly over multiple months for a single underlying expense.

55. These practices applied uniformly across WPI's operations and affected all managers and agents subject to WPI's compensation model.

**E. Equipment "Manager Liability" Forms and Chargeback Practices (October 2023)**

56. To enable merchants to process credit card transactions, WPI provides point-of-sale equipment to merchants. WPI offers certain basic models (Valor VL 550 and Valor 100) for free as a merchant acquisition incentive.

57. For other equipment, WPI charges merchants either upfront or through deductions from future transaction processing.

58. Beginning in or around October 2023, WPI required all managers to sign standardized "Manager Liability Forms" that authorized WPI to deduct "the greater of $100 or the Total Liability amount" from managers' residuals if merchant accounts receiving equipment were "not processing within 45 days."

59. The Manager Liability Forms stated: "Chargebacks will occur as soon as reasonably possible or against the next scheduled residual payout date. Such chargebacks should reduce the total amount paid to the sales manager and not increase any balances owed."

60. WPI frequently imposed these chargebacks on managers even where:

a. Merchants or agents had already paid WPI for the equipment; and/or

b. Equipment was returned to WPI and subsequently redeployed to another merchant, resulting in WPI recovering the same equipment cost from multiple parties across multiple transactions.

61. These practices systematically reduced managers' residual payments below amounts contractually owed and, in certain workweeks, reduced compensation below minimum

wage and/or unlawfully cut into overtime compensation.

**F. The "Do Not Accept" (DNA) List Policy (March 2022)**

62. In or around March 2022, WPI implemented a uniform policy (the "DNA List Policy") under which any agent whose "install ratio," i.e., the ratio of approved merchant applications to equipment actually installed, fell below 70% was placed on a "Do Not Accept" list that prohibited the agent from boarding new merchant accounts without express written authorization from WPI's CEO or President.

63. Placement on the DNA List had the uniform effect of:

a. Substantially reducing the number of merchants those agents could board and the residuals they could generate; and

b. Prompting agents to leave WPI and transfer their existing merchant accounts to other processors.

64. Because managers' compensation depended directly on their teams' merchant onboarding and residual generation, the DNA List Policy systematically reduced managers' earnings under their base compensation agreements and prevented them from satisfying contingent payment conditions in portfolio purchase agreements.

65. The DNA List Policy was applied uniformly across WPI's operations and affected all managers whose agents fell below the 70% threshold, regardless of whether the manager caused or could have prevented the low install ratio.

**G. Portfolio Purchase Agreements (PPAs) with Uniform Contingencies**

66. WPI used standardized Portfolio Purchase Agreements with managers, including Plaintiff, under which WPI purportedly purchased managers' residual streams through:

a. An initial lump-sum payment; and

b. Contingent additional payments conditioned on managers referring specified numbers of "new merchant accounts" that were "approved, boarded, and processing" and that met WPI-defined production thresholds.

67. These PPAs contained uniform contingent payment structures keyed to metrics entirely within WPI's control, including:

a. WPI's approval and onboarding of merchant applications (which WPI could refuse through the DNA List Policy);

b. WPI's definition of what constituted a qualifying "new merchant account";

c. WPI's selection of which merchant accounts to permanently retain for its own benefit; and

d. Requirements that merchants be "actively processing" at the precise time contingent payments became due (a condition WPI could manipulate through the DNA List Policy and other operational decisions).

68. By implementing the DNA List Policy, imposing arbitrary equipment chargebacks, and manipulating cost structures through IRIS, WPI systematically prevented managers from satisfying PPA contingencies and earning the compensation WPI had promised during recruitment.

**H. WPI's Knowledge and Willfulness**

69. WPI knew or should have known that its uniform policies and practices, including W-2 payroll, benefits, fixed schedules, centralized office work, mandatory branding, unilateral cost changes, standardized chargeback and PPA frameworks, and the DNA List Policy, were inconsistent with independent-contractor status under the FLSA's economic realities test.

70. WPI's policies applied uniformly to Plaintiff and other managers and similarly situated personnel.

71. WPI's violations of the FLSA were willful within the meaning of 29 U.S.C. § 255(a), in that WPI knew or showed reckless disregard for whether its conduct violated the FLSA.

## V. PUTATIVE COLLECTIVE AND CLASS ALLEGATIONS

### A. FLSA Collective (29 U.S.C. § 216(b))

72. **Definition**. Plaintiff brings this case as a collective action on behalf of all persons who worked for WPI in the United States as sales managers, team leaders, or similarly titled personnel who were classified as independent contractors in form agreements yet were paid as W-2 employees and/or worked under WPI's centralized schedules, policies, and offices during the three years preceding the filing of this action through final judgment (the "FLSA Collective").

73. **Similarly Situated Allegations**. FLSA Collective members are similarly situated because they were subject to WPI's common policies and practices described above, including:

a. Centralized scheduling and fixed work hours at WPI-controlled offices;

b. Mandatory use of WPI-provided tools, infrastructure, and branding;

c. Uniform residual/override compensation structures calculated using WPI-controlled cost inputs;

d. Standardized Portfolio Purchase Agreements with contingent payments keyed to WPI-controlled metrics;

e. The system-wide transition from MX ISO/Agent to IRIS (March 2024) and resulting uniform residual reductions;

f. The DNA List Policy (beginning March 2022) preventing merchant onboarding;

g. Manager Liability Forms (beginning October 2023) imposing standardized equipment chargebacks; and

h. Production quotas, metrics, and supervision indicating employee status under the economic realities test.

74. **Common Job Duties**. FLSA Collective members' job duties were materially the same: recruiting, training, and managing sales agents; maintaining production metrics; overseeing office operations; and reporting to WPI leadership—not personally originating merchant accounts.

75. **Economic Realities Factors**. The economic realities factors establishing employee status (integral part of business, managerial skill, investment, profit/loss opportunity, permanence, and control) are materially the same for all FLSA Collective members based on the common policies described above.

76. **Consent to Join**. Each FLSA Collective member must consent in writing to join this action pursuant to 29 U.S.C. § 216(b).

77. **Representative Adequacy**. Plaintiff's claims are typical of the FLSA Collective's claims, and Plaintiff will fairly and adequately protect the interests of the FLSA Collective.

78. **Numerosity**. On information and belief, the FLSA Collective includes at least 50-100 individuals who worked as managers or similarly titled personnel during the relevant period, making joinder impracticable.

**B. Texas Rule 23 Class (Alternative/Additional)**

79. **Texas Deductions/Residuals Class Definition**. Plaintiff also seeks to represent a class under Fed. R. Civ. P. 23(b)(3) (or, alternatively, under Texas substantive law if supplemental jurisdiction applies) defined as: All persons in Texas whom WPI classified as managers, team leaders, or similarly titled personnel and from whom WPI:

a. Made deductions, set-offs, or chargebacks pursuant to standardized Manager Liability Forms or other uniform policies;

b. Applied retroactive cost changes or manipulated residual calculations through the IRIS reporting system; and/or

c. Withheld contingent residual payments under Portfolio Purchase Agreements through application of the DNA List Policy or other standardized practices,

d. during the applicable limitations period.

80. Rule 23(a) Requirements:

a. **Numerosity (Rule 23(a)(1))**. The class is sufficiently numerous that joinder of all members is impracticable. On information and belief, the class includes at least 30-50 Texas-based managers during the relevant period.

b. **Commonality (Rule 23(a)(2))**. Questions of law and fact are common to the class, including: - Whether WPI's Manager Liability Forms are supported by adequate consideration; - Whether WPI's equipment chargebacks violated managers' compensation agreements when equipment was paid for by other parties or returned/redeployed; - Whether WPI's retroactive cost changes breached managers' agreements; - Whether WPI's manipulation of residual calculations through IRIS breached managers' agreements and/or constituted fraud; - Whether WPI's DNA List Policy breached the implied duty of good faith and fair dealing and/or the implied duty to cooperate in Portfolio Purchase Agreements; - Whether WPI's uniform policies frustrated the essential purpose of Portfolio Purchase Agreements; - Whether WPI's standardized restrictive covenants are enforceable given WPI's breaches and fraudulent inducement; and - The validity and enforceability of WPI's uniform policies, forms, and practices under Texas law.

c. **Typicality (Rule 23(a)(3))**. Plaintiff's claims are typical of the class because Plaintiff was subject to the same policies, forms, and practices as all class members

and suffered the same categories of injury (unpaid residuals, improper deductions, withheld contingent payments) arising from WPI's uniform conduct.

d. **Adequacy (Rule 23(a)(4))**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests antagonistic to the class and is represented by competent counsel experienced in complex class action litigation.

81. Rule 23(b)(3) Requirements:

a. **Predominance**. Questions of law and fact common to class members predominate over individual questions. WPI's policies, forms, and practices were uniform and applied across all class members. The interpretation and validity of standardized agreements, forms, and policies are common questions that can be resolved on a class-wide basis.

b. **Superiority**. A class action is superior to individual suits because: - Individual damages may be insufficient to justify separate actions; - Class treatment promotes judicial efficiency and consistent adjudication; - WPI's records allow for calculation of damages on a class-wide basis; and - There is no indication of difficulties in managing this case as a class action.

82. **Trial Plan**. Plaintiff will submit a detailed trial plan addressing class-wide and individual issues in phases, including:

a. Phase 1: Class-wide liability on common questions (validity of uniform policies, breach of standardized agreements, fraudulent misrepresentations);

b. Phase 2: Individual damages calculation using WPI's records and standardized formulas.

## VI. CAUSES OF ACTION

**COUNT I**
**FLSA OVERTIME MISCLASSIFICATION (29 U.S.C. §§ 207, 216(b))**
**(On behalf of Class Plaintiff and the FLSA Collective against the WPI Enterprise)**

83. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

84. WPI is an employer, and Plaintiff and FLSA Collective members are/were employees under the FLSA, 29 U.S.C. §§ 203(d), 203(e)(1).

85. WPI is and has been an enterprise engaged in commerce or in the production of goods for commerce, with annual gross volume exceeding $500,000. 29 U.S.C. §§ 203(b), 203(r), 203(s)(1).

86. Plaintiff and FLSA Collective members were individually engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207, as their regular duties involved using instrumentalities of interstate commerce (telephones, email, internet platforms) to recruit agents and facilitate merchant applications and payment processing with entities located across state lines.

87. WPI suffered or permitted Plaintiff and FLSA Collective members to work over forty (40) hours in one or more workweeks without paying overtime at one-and-one-half times the regular rate, as required by 29 U.S.C. § 207(a)(1).

88. WPI's uniform policies and practices demonstrate employee status under the economic realities test, including:

a. **Integral Part of Business**: Managers' work recruiting, training, and managing sales agents was integral to WPI's core ISO business operations;

b. **Managerial Skill**: Managers exercised minimal independent managerial skill; they followed WPI's standardized procedures, production metrics, and reporting

requirements;

c. **Investment**: Managers made no significant capital investment; WPI provided office space, computers, utilities, infrastructure, and all tools necessary to perform work;

d. **Profit/Loss Opportunity**: Managers had no meaningful opportunity for profit or loss through independent business judgment; their compensation was determined by WPI-controlled cost structures, reporting systems, and policies (IRIS, DNA List, equipment chargebacks);

e. **Permanence**: The relationship was indefinite and permanent, not project-based or transient;

f. **Control**: WPI exercised extensive control through centralized office requirements, fixed schedules, mandatory lunch breaks, hourly task lists, production quotas, mandatory branding, and supervision.

89. No exemption (including outside-sales under 29 C.F.R. § 541.500 et seq., or administrative under 29 C.F.R. § 541.200 et seq.) applies on these facts.

90. Managers' primary duties were recruiting, training, and supervising agents and maintaining office operations, not making sales or obtaining orders from customers. Managers did not regularly engage in sales activities away from WPI's office or perform work qualifying for the outside-sales exemption.

91. WPI's violations were willful within the meaning of 29 U.S.C. § 255(a), in that WPI knew or showed reckless disregard for whether its conduct violated the FLSA.

92. WPI failed to maintain accurate time records as required by 29 U.S.C. § 211(c) and 29 C.F.R. Part 516.

93. As a direct and proximate result of WPI's wrongful conduct, Plaintiff and FLSA Collective members have suffered loss of overtime compensation.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the FLSA Collective against the WPI Enterprise as follows:

a. Requiring WPI to pay all unpaid overtime wages;

b. Enforcing liquidated damages under 29 U.S.C. § 216(b);

c. Granting the FLSA Collective its reasonable attorneys' fees and costs under 29 U.S.C. § 216(b);

d. Awarding pre- and post-judgment interest; and

e. Granting any further relief that this Court deems fair and just.

**COUNT II**
**FLSA MINIMUM WAGE / ANTI-KICKBACK (29 U.S.C. § 206; 29 C.F.R. § 531.35)**
**(On behalf of Class Plaintiff and the FLSA Collective (in the alternative, as applicable) against the WPI Enterprise)**

94. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

95. In certain workweeks, WPI's deductions, set-offs, and "Manager Liability" chargebacks, including recapture tied to equipment costs even where equipment was paid for by other parties or returned and redeployed, reduced Plaintiff's and FLSA Collective members' wages below the minimum required by 29 U.S.C. § 206 and/or unlawfully cut into overtime compensation due under 29 U.S.C. § 207.

96. These deductions and chargebacks violated the FLSA's anti-kickback rule, 29 C.F.R. § 531.35, which prohibits employers from receiving back any part of wages required under the FLSA.

97. WPI's uniform equipment chargeback policies applied across all managers through

the standardized Manager Liability Forms implemented in October 2023.

98. As a direct and proximate result, Plaintiff and FLSA Collective members have suffered loss of minimum wages and/or overtime compensation.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the FLSA Collective against the WPI Enterprise as follows:

a. Awarding unpaid minimum wages and overtime impacted by unlawful deductions;

b. Awarding liquidated damages under 29 U.S.C. § 216(b);

c. Granting their reasonable attorneys' fees and costs;

d. Awarding pre- and post-judgment interest; and

e. Granting any further relief that this Court deems fair and just.

**COUNT III**
**BREACH OF CONTRACT (TEXAS LAW)**
**(On behalf of Class Plaintiff and a Rule 23(b)(3) Texas Subclass against the WPI Enterprise)**

99. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

100. Plaintiff and Texas subclass members entered into standardized written compensation agreements with WPI, including:

a. Manager/Agent Agreements with uniform Addenda A and B;

b. Portfolio Purchase Agreements with contingent payments keyed to uniform "approved, boarded, and processing" metrics and WPI-controlled production thresholds; and

c. Manager Liability Forms with standardized equipment chargeback terms.

101. WPI breached these agreements by:

a. Failing to pay earned commissions, residuals, and contingent payments as

required by the uniform terms of managers' agreements and PPAs;

b. Billing managers on a "cost-plus" basis rather than passing through WPI's actual vendor costs as required by uniform agreement language stating managers would receive "the same cost structure as WPI is charged by its vendors";

c. Unilaterally and retroactively altering cost/buy-rate inputs in residual formulas across existing merchant accounts without contractual authority, contrary to language promising pass-through vendor costs and adequate reporting;

d. Implementing and applying the “DNA List” Policy and other internal policies that prevented qualifying “new merchant accounts” from being approved/boarded/processing at the very times contingent PPA payments came due, thereby wrongfully preventing the occurrence of conditions precedent that were within WPI’s control;

e. Imposing equipment “Manager Liability” chargebacks despite payment by merchants or agents and/or the return and redeployment of equipment, resulting in multiple recoveries for the same hardware and a reduction of earned compensation;

f. Failing to provide contractually required residual statements with sufficient detail to verify the accuracy of payments; and

g. Failing to pay earned commissions, residuals, and contingent PPA sums when due.

102. Plaintiff and the Texas subclass substantially performed or were excused from further performance by WPI’s prior material breaches and/or WPI’s prevention of conditions precedent.

103. As a direct and proximate result, Plaintiff and the subclass suffered damages

including unpaid residuals, unpaid contingent PPA amounts, unlawful chargebacks/deductions, and consequential damages.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Awarding expectation damages;

b. Awarding benefit-of-the-bargain damages;

c. Enforcing restitution/disgorgement of improperly deducted sums;

d. Awarding pre- and post-judgment interest;

e. Granting their fees and costs as allowed by contract or law; and

f. Granting any further relief that this Court deems fair and just.

**COUNT IV**
**BREACH OF THE IMPLIED DUTY NOT TO HINDER PERFORMANCE / PREVENTION DOCTRINE (TEXAS LAW)**
**(On behalf of Class Plaintiff and a Rule 23(b)(3) Texas Subclass against the WPI Enterprise)**

104. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

105. Texas law implies a duty in every contract that neither party will hinder the other's performance and will reasonably cooperate in satisfaction of conditions precedent.

106. WPI violated that duty by, among other things:

(a) instituting and applying the DNA List Policy to withhold approvals and block boarding;

(b) manipulating IRIS inputs and retroactively changing costs; and

(c) imposing chargebacks that suppressed residuals

each of which frustrated and/or prevented Plaintiff and class members from meeting PPA

contingencies and from receiving bargained-for compensation.

107. But for WPI's hindrance, contingencies would have been satisfied and additional payments made.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Awarding damages measured by the payments that would have been earned absent WPI's hindrance;

b. Granting equitable reformation and/or excusal of prevented conditions;

c. Awarding fees and costs as allowed; and

d. Granting any further relief that this Court deems fair and just.

## COUNT V
## FRAUDULENT INDUCEMENT (TEXAS LAW)
**(On behalf of Class Plaintiff and the Rule 23(b)(3) Texas Subclass (or individual claim if certification is denied) against the WPI Enterprise)**

108. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

109. WPI (through its CEO and authorized agents) made material, uniform misrepresentations, including "40× buyout opportunities" with no production requirements, to induce Plaintiff and others to join WPI and execute standard agreements and PPAs.

110. These statements were false when made (or made with reckless disregard for their truth), concerned present intentions and program structure uniquely within WPI's knowledge and control, and were repeated in recruitment/training materials to create a false impression of guaranteed, contingency-free buyouts.

111. Plaintiff reasonably relied by leaving prior employment, joining WPI, and agreeing to standardized terms; WPI's later-revealed PPA contingencies and internal policies (DNA List,

IRIS manipulation, chargebacks) directly contradicted the recruitment promises.

112. Plaintiff and class members suffered injury, including lost earnings, foregone opportunities, and reduced compensation.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Awarding out-of-pocket and benefit-of-the-bargain damages;

b. Awarding exemplary damages as permitted;

c. Rescissionary restitution in the alternative;

d. Awarding fees and costs; and

e. Granting any further relief that this Court deems fair and just.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION (TEXAS LAW, IN THE ALTERNATIVE)**
**(On behalf of Class Plaintiff and the Rule 23(b)(3) Texas Subclass (or individual claim if certification is denied) against the WPI Enterprise)**

113. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

114. In the course of WPI's business, WPI supplied false information (including the 40× no-contingency buyout representations and pass-through cost promises) for the guidance of Plaintiff and others.

115. WPI failed to exercise reasonable care or competence in obtaining or communicating the information, and Plaintiff justifiably relied to their detriment.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Awarding reliance damages; and

b. Granting any further relief that this Court deems fair and just.

**COUNT VII**
**UNJUST ENRICHMENT / MONEY HAD AND RECEIVED (ALTERNATIVE/EQUITY)**
**(On behalf of Class Plaintiff, the FLSA Collective (as to FLSA issues), and the Rule 23 Class against the WPI Enterprise)**

116. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

117. If and to the extent any contract remedy is unavailable, WPI was unjustly enriched by retaining monies through (a) unauthorized/duplicative chargebacks; (b) retroactive cost increases; and (c) multi-party billing of the same "costs" to merchants, agents, and managers.

118. In equity and good conscience, those funds belong to Plaintiff and the class.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the FLSA Collective and Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Enforcement of restitution damages;

b. Enforcing a disgorgement of ill-gotten gains, and

c. Enforcement of a constructive trust over ill-gotten sums.

**COUNT VIII**
**DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202)**
**(On behalf of Class Plaintiff, the FLSA Collective (as to FLSA issues), and the Rule 23 Class against the WPI Enterprise)**

119. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

120. An actual justiciable controversy exists regarding, inter alia:

a. the parties' rights and obligations under standardized compensation agreements, PPAs, and Manager Liability Forms;

b. the permissibility of WPI's retroactive cost changes, multi-party billing, and

equipment chargebacks where equipment is paid for/returned/redeployed;

c. the effect of the DNA List Policy on PPA contingencies; and

d. the enforceability of restrictive covenants in light of WPI's breaches, prevention, and fraudulent inducement.

121. Plaintiff seeks declarations that:

a. WPI's retroactive cost changes and IRIS-based manipulation breached contractual promises of pass-through vendor costs and adequate reporting;

b. the Manager Liability chargebacks are unlawful in the circumstances pleaded;

c. WPI's prevention/hindrance excuses and/or satisfies PPA contingencies;

d. classwide accounting is required; and

e. restrictive covenants are unenforceable or must be reformed due to WPI's prior material breaches and fraudulent inducement.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the FLSA Collective and Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Entering declarations as stated above; and

b. Granting any further relief that this Court deems fair and just.

**COUNT IX**
**ACCOUNTING AND CONSTRUCTIVE TRUST (EQUITABLE)**
**(On behalf of Class Plaintiff, the FLSA Collective (as to FLSA issues), and the Rule 23 Class against the WPI Enterprise)**

122. Plaintiff repeats and realleges each allegation in paragraphs 1-82 as if fully set forth herein.

123. Residual and override payments were calculated exclusively with information in

WPI's possession after the IRIS transition; the accounts are complex and require detailed tracing.

124. An equitable accounting is necessary to determine amounts wrongfully withheld or recouped and to identify duplicative/retroactive charges.

125. A constructive trust should be imposed on all amounts WPI wrongfully obtained via unauthorized deductions, multi-party billing, and retroactive cost increases.

WHEREFORE, Class Plaintiff respectfully requests that this Court enter an Order in their favor on behalf of the FLSA Collective and Rule 23(b) Texas Subclass against the WPI Enterprise as follows:

a. Ordering an equitable accounting;

b. Enforcement of constructive trust over ill-gotten gains;

c. Enforcement of restitution damages;

d. Ordering a disgorgement of ill-gotten gains; and

e. Granting any further relief that this Court deems fair and just.

## VII. COLLECTIVE AND CLASS RELIEF REQUESTED

126. **FLSA Notice & Management**. Plaintiff requests that the Court (a) authorize and supervise notice to the FLSA Collective under 29 U.S.C. §216(b) consistent with Fifth Circuit guidance; (b) require WPI to produce a roster with contact information; and (c) equitably toll limitations for putative opt-ins from the filing date to the date of their consents.

127. **Rule 23 Certification**. Plaintiff seeks certification of the Texas Deductions/Residuals Class (and any appropriate subclasses) under Rule 23(a) and (b)(3), or, in the alternative and as to injunctive/declaratory issues, under Rule 23(b)(2); appointment of Plaintiff as class representative; and appointment of undersigned counsel as class counsel under Rule 23(g).

128. **Classwide Remedies**. Classwide damages/restitution can be calculated using WPI's uniform records and standardized formulas; injunctive/declaratory relief will resolve common liability questions in one stroke.

## VIII. LIMITATIONS, TOLLING, AND RESERVATIONS

129. Fraudulent concealment and WPI's exclusive control of residual data tolled limitations on state-law claims. Any contractual limitations periods are unconscionable/as-applied where WPI prevented discovery of claims by obscuring data in IRIS and denying detailed statements.

130. WPI further prevented discovery of claims by failing to suspend its auto-deletion procedures when it reasonably knew a dispute arose.

131. Plaintiff reserves the right to amend to add additional parties/claims after class discovery and the accounting described above.

## IX. PRAYER FOR RELIEF

Plaintiff, individually, on behalf of the FLSA Collective, and on behalf of the Rule 23 Class, requests judgment:

A. **FLSA (Counts I–II)**: Unpaid overtime/minimum wages; liquidated damages; injunctive relief prohibiting unlawful deductions/"kickbacks"; attorneys' fees, costs, and post-judgment interest under 29 U.S.C. §216(b).

B. **Contract/Prevention (Counts III–IV)**: Benefit-of-the-bargain damages; excusal of prevented conditions; payment of contingent PPA sums; consequential damages; interest; and fees/costs as allowed.

C. **Fraud / Negligent Misrepresentation (Counts V–VI)**: Out-of-pocket and benefit-of-the-bargain damages; exemplary damages as permitted; or rescissionary restitution in the

alternative.

D. **Unjust Enrichment / Money Had & Received (Count VII)**: Restitution/disgorgement and a constructive trust over ill-gotten sums.

E. **Declaratory Relief (Count VIII)**: Declarations as pleaded and further necessary and proper relief under 28 U.S.C. §§2201–2202.

F. **Accounting/Constructive Trust (Count IX)**: An equitable accounting of all residual/override and chargeback calculations and a constructive trust over amounts wrongfully withheld.

G. **Class/Collective Certification**: Orders certifying the FLSA Collective under §216(b) and the Texas Deductions/Residuals Class under Rule 23, appointing Plaintiff as representative and undersigned counsel as class counsel, authorizing notice, and equitably tolling limitations.

H. Any other relief, legal or equitable, that this Court deems fair and just.

## X. JURY DEMAND

Plaintiff demands a trial by jury on all issues triable to a jury.

Dated: December 19, 2025

ROBERT J. BOGDANOWICZ III
Texas Bar No. 24064916
rob@burkebog.com
J. COLLIN SPRING
Texas Bar No. 24118989
jspring@burkebog.com

**BURKE BOGDANOWICZ PLLC**
1201 Elm Street, Suite 4000
Dallas, Texas 75270
(214)888-2824 (Tel./Fax)

ATTORNEYS FOR CLASS PLAINTIFF
JEREMIAH PYLE